UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

FORDE COPPIN,

                                   Plaintiff,

                                     v.

THE NEW YORK CITY HOUSING
AUTHORITY,

                                   Defendant.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 7, 2016

14 Civ. 7032 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

       On August 29, 2014, Plaintiff Forde Coppin initiated this action against his employer, the New York City Housing Authority ("NYCHA"), alleging that it discriminated against him on account of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and 42 U.S.C. § 1981. On October 30, 2015, NYCHA filed motions for summary judgment and for sanctions against Plaintiff and his attorney for their conduct during discovery. For the reasons set forth in the remainder of this Opinion, the Court will grant NYCHA's motion for summary judgment, but deny its motion for sanctions.

**BACKGROUND**[1]

**A.     Factual Background**

    **1.     Plaintiff's Background**

Plaintiff is an African American man "of Caribbean Nationality."
(Emanuel Decl., Ex. 1 ¶ 3).  He received a Bachelor of Science degree from
Queen's University in Ontario, Canada, in 1982, and a Master of Business
Administration degree from Baruch College in 1991.  (*Id.* at ¶¶ 4-5).  Plaintiff is
also a licensed professional engineer in New York and Florida.  (*Id.* at ¶ 6).

    **2.     Plaintiff's Employment with NYCHA**

NYCHA is an entity that provides affordable housing for New York City
residents.  In the fall of 2000, Plaintiff was hired as a Construction Project
Manager in NYCHA's Construction Department.  (Def. 56.1 ¶¶ 3-4).  In that
role, Plaintiff supervised a variety of construction projects, including "roof
replacement, apartment[] restoration, community center[] restorations[,] ...

---

[1]    The facts in this Opinion are drawn from the parties' submissions in connection with
the motion for summary judgment, including Defendant's Local Rule 56.1 Statement
("Def. 56.1" (Dkt. #41)), Plaintiff's Rule 56.1 Counter-Statement ("Pl. 56.1" (Dkt. #43)),
and the attorney declarations of Jane E. Lippman ("Lippman Decl." (Dkt. #40)) and
Lennox Emanuel ("Emanuel Decl." (Dkt. #45)).  Citations to a party's Rule 56.1
Statement incorporate by reference the documents cited therein.  Where facts stated in
a party's Rule 56.1 Statement are supported by testimonial or documentary evidence,
and denied with only a conclusory statement by the other party, the Court finds such
facts to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the
statement of material facts set forth in the statement required to be served by the
moving party will be deemed to be admitted for purposes of the motion unless
specifically controverted by a corresponding numbered paragraph in the statement
required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the
movant or opponent . . . controverting any statement of material fact[] must be followed
by citation to evidence which would be admissible, set forth as required by Fed. R. Civ.
P. 56(c).").

For convenience, the Court will refer to Defendant's opening brief as "Def. Br." (Dkt.
#34), Plaintiff's opposition brief as "Pl. Opp." (Dkt. #42), and Defendant's reply brief as
"Def. Reply" (Dkt. #53).

grounds work, [and] grounds improvement." (*Id.* at ¶ 17). As the supervisor of these projects, Plaintiff managed outside consultants and coordinated with property managers. (*Id.* at ¶ 16).

In late 2003, NYCHA underwent a corporate reorganization. (Def. 56.1 ¶ 5). As a result of the reorganization, Plaintiff became an Administrative Construction Project Manager in the Capital Projects Division. (*Id.* at ¶ 8). In this capacity, Plaintiff focused on the renovation and rehabilitation of community centers. (*Id.* at ¶ 18). Among other tasks, Plaintiff reviewed designs for various community centers to ensure that the designs met NYCHA's requirements. (*See id.* at ¶¶ 18-19).

In January 2008, NYCHA underwent a second reorganization, which cost Plaintiff his "Project Manager" title. (Def. 56.1 ¶¶ 10-12). Plaintiff was demoted to the position of Civil Engineer, and his salary and benefits were reduced. (*Id.* at ¶ 12; Pl. 56.1 ¶ 12). While Plaintiff was working as a Civil Engineer, he did not have any subordinates who reported directly to him. (Def. 56.1 ¶ 13).

Effective April 21, 2014, Plaintiff was promoted to the position of Administrative Engineer. (Def. 56.1 ¶ 14). With this promotion, Plaintiff received a salary increase of $10,000 to $15,000. (*Id.* at ¶ 15).

### 3.    The Alleged Employment Discrimination

#### a.    The Filling of Vacancy 812

NYCHA's Capital Projects Office of Design (the "Office of Design") consists of architects and engineers who design various buildings for New York City residents. The Office of Design has two deputy directors, one for architecture

3

and one for engineering.  (Def. 56.1 ¶ 29).  Both deputies report to the Director

of the Office of Design, Scott Groom.  (*Id.*)

In April 2012, the Office of Design began a search for a new Deputy

Director for Engineering (the "Deputy Director").  (Def. 56.1 ¶ 27).  The new

Deputy Director would be responsible for:

> [i] [m]anag[ing] NYCHA's Engineering Design Group
> (Structural, Mechanical, Electrical and Plumbing Units)
> from planning through construction completion[;]
> [ii] [d]istribut[ing] work assignments to senior engineer
> staff[] [and] monitor[ing] progress of project designs,
> field condition reports and construction support[;]
> [iii] [c]oordinat[ing] with Program Units for work load,
> scope, design, budget, scheduling, and construction
> administration[;] [iv] [p]rovid[ing] support to Operations
> and Management …[;] [v] [r]eview[ing] feasibility and
> budget requirements …[;] [vi] [p]repar[ing] management
> and analysis reports for [the] Director[] [of the] Capital
> Projects Division and Executive Department[;]
> [vii] [c]oordinat[ing] special projects as requested by the
> Vice President[] [of the] the Capital Projects Division[;]
> [viii] [r]epresenting the Office of Design in inter-
> departmental and regulatory agency (DOP, DEP)
> meetings[;] [ix] [p]rioritiz[ing] design planning[] [and]
> coordinat[ing] and manag[ing] design projects to ensure
> completion within schedule and budget[;] [x] [s]igning
> and seal[ing] documents as [a] Professional Engineer[;]
> [xi] [a]nalyz[ing] and sign[ing] off on reports prepared by
> senior engineers of all disciplines[;] and [xii] [p]rovid[ing]
> direction to senior engineers on key design, budget and
> schedule decisions.

(Lippman Decl., Ex. 17).

To facilitate the search for the Deputy Director, the Office of Design

drafted a "managerial vacancy posting," which referred to the open deputy

position as Vacancy 812.  (Lippman Decl., Ex. 17).  According to the vacancy

posting, candidates for Vacancy 812 needed to have a "valid New York State

4

License as a Professional Engineer." (*Id.*).  In addition, candidates needed "six (6) years of full-time paid experience in civil, mechanical, electrical, chemical, or air pollution control engineering work," and at least two years of experience "as an administrative engineer." (*Id.*).  Finally, the vacancy posting indicated that candidates for the Deputy Director position should possess four "skills desired": (i) an "ability to clearly and precisely communicate ideas and expectations"; (ii) an "[a]bility to nurture, inspire, mentor and direct staff in a positive and professional manner"; (iii) an ability to "[i]mplement a full understanding of the coordination and constructability of comprehensive Bid Documents"; and (iv) "a profound knowledge of structural, mechanical and electrical engineering principles." (*Id.*).

Candidates for Vacancy 812 were interviewed in two phases.  (Def. 56.1 ¶ 36).  During the first round of interviews, candidates spoke with Scott Groom, the Director of the Office of Design; Raymond Stefanowicz, the Vice President for Capital Planning and Design; and Farhan Syed, the Vice President for Construction Projects.  (*Id.* at ¶ 37).  The interviewers asked questions about the candidates' work experience and technical qualifications. (*Id.* at ¶ 36).  Based on the candidates' answers to these questions, the interviewers selected five individuals for a second round of interviews.  (*See id.* at ¶ 52).

The second-round interviews were conducted by a panel of four people: to the three individuals who conducted the first-round interviews was added Adam Eagle, the Deputy Director for Support Services in the Capital Projects

Division.  (Def. 56.1 ¶ 38).  The second-round interviews were designed to evaluate the candidates' managerial, supervisory, and team-building skills.  (*Id.* at ¶ 36).  To gauge the candidates' relative strengths, Mr. Eagle prepared a set list of questions, which the panel posed to all of the interviewees.  (*Id.* at ¶ 55).  Mr. Eagle took notes on the candidates' responses to each question.  (*Id.* at ¶ 57).  After the second interview, the panelists conferred with one another and made a group decision about the best candidate for the job.  (*See id.* at ¶ 72; Lippman Decl., Ex. 8 at 20-21).

Plaintiff applied for Vacancy 812, and was selected for the first round of interviews.  (Def. 56.1 ¶ 39).  In light of his qualifications and his performance during the first interview, Plaintiff was selected for a second interview.  (*See id.* at ¶ 43).  Ultimately, however, the panel selected another candidate — Vesna Hadzibabic — to fill the Deputy Director position.  (*Id.* at ¶ 64).

### b.    Other Alleged Discriminatory Conduct

In a much more perfunctory manner, Plaintiff further alleges that he was excluded from design and progress meetings.  (Emanuel Decl., Ex. 1 ¶¶ 11-16).  Specifically, Plaintiff claims that he was excluded from meetings related to the Davidson Houses Community Center Project and meetings related to Hurricane Sandy reconstruction.  (*See id.*).[2]  Plaintiff also alleges that he was "relegated to performing simple administrative tasks."  (*Id.* at ¶ 12).

---

[2]    Plaintiff's evidence that his exclusion from the Hurricane Sandy meetings was the product of race-based discrimination, as articulated at his deposition, is that "[t]he guys that were involved in those meetings are primarily Caucasians.  I'm black, right?"  (Pl. 56.1 ¶ 98).

**B.      Procedural Background**

On August 29, 2014, Plaintiff initiated this action, alleging that NYCHA

violated his rights under Title VII, Section 1981, the Due Process Clause of the

Fourteenth Amendment, and the Equal Protection Clause of the Fourteenth

Amendment.  (*See generally* Compl.).  Following a conference on March 6,

2015, the Court — with the consent of both parties — dismissed all claims

based on discriminatory acts that occurred prior to April 4, 2012, and all of

Plaintiff's constitutional claims.  (*See* Dkt. #20).

On October 30, 2015, Defendant filed the instant motion for summary

judgment on Plaintiff's remaining claims.  (Dkt. #33-41).  Plaintiff filed his

opposition papers on December 4, 2015 (Dkt. #42-45), and briefing was

completed with the filing of Defendant's reply papers on December 28, 2015

(Dkt. #53-55).

## DISCUSSION

**A.      Applicable Law**

**1.      Summary Judgment Motions Generally**

Under Federal Rule of Civil Procedure 56(a), summary judgment may be

granted only if all the submissions taken together "show that there is no

genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322

(1986); *accord Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The moving party bears the initial burden of demonstrating "the absence

of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is

"material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *see also Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, in considering "what may reasonably be inferred" from witness testimony, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (citing *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).

### 2.    Summary Judgment in Discrimination Cases

In discrimination cases, particularly those where intent is the principal issue in dispute, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer* v. *Norden Sys.*, 151 F.3d 50, 54 (2d Cir. 1998) (citations and footnote omitted). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb* v. *Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). In other words, a plaintiff "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys*, 426 F.3d at 554 (internal citation and

quotation marks omitted); *see also Bickerstaff* v. *Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) (admonishing courts to "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture"). The ultimate test for summary judgment in discrimination cases, as in other cases, "is whether the evidence can reasonably support a verdict in plaintiff's favor." *James* v. *N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

### 3. Evaluating Discrimination Claims Under Title VII and Section 1981

Employment discrimination claims under Title VII and Section 1981 are analyzed using the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792 (1973). *See Holcomb*, 521 F.3d at 138; *see also Tolbert* v. *Smith*, 790 F.3d 427, 434 (2d Cir. 2015). At step one of the *McDonnell Douglas* analysis, a plaintiff must present evidence supporting a *prima facie* case of discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802. To meet this burden, a plaintiff must show that: (i) he belongs to a protected class; (ii) he was qualified for the position at issue; (iii) he suffered an adverse employment action; and (iv) that action occurred under circumstances giving rise to an inference of discrimination. *See id.*; *Holcomb*, 521 F.3d at 138. The Second Circuit has emphasized that the "burden of establishing a prima facie case is *de minimis*." *Abdu-Brisson* v. *Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir. 2001).

If a plaintiff successfully presents a *prima facie* case of discrimination, the burden shifts to the defendant to offer legitimate and nondiscriminatory

10

reasons for the adverse employment action.  *Abdu-Brisson,* 239 F.3d at 466,

468-69.  The defendant's burden at this step in the analysis is also "light."

*Greenway* v. *Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir. 1998).

At the third step of the *McDonnell Douglas* framework, the burden shifts

back to the plaintiff to prove intentional discrimination by a preponderance of

the evidence.  *See Holcomb*, 521 F.3d at 138; *Fields* v. *N.Y. State Office of*

*Mental Retardation & Developmental Disabilities,* 115 F.3d 116, 121 (2d Cir.

1997).  The plaintiff may carry this burden "either by proving that a

discriminatory motive, more likely than not, motivated the defendants or by

proving both that the reasons given by the defendants are not true and that

discrimination is the real reason for the actions."  *Gordon* v. *N.Y.C. Bd. of Educ.,*

232 F.3d 111, 117 (2d Cir. 2000) (quoting *Fields,* 115 F.3d at 121); *see also*

*Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).[3]

## B.    Analysis

### 1.    Defendant Is Entitled to Summary Judgment on Plaintiff's Employment Discrimination Claims

#### a.    Plaintiff Has Not Met His Burden With Respect to the Vacancy 812 Claim

Defendant persuasively argues that Plaintiff has failed to meet his

burden of demonstrating a *prima facie* case under either of Title VII or Section

---

[3]    To prevail on a Section 1981 claim against a municipality (or municipal agency, such as NYCHA), a plaintiff must demonstrate that the alleged violation was "caused by a custom or policy within the meaning of *Monell* and subsequent cases."  *Jett* v. *Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735-36 (1989) (citing *Monell* v. *N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).  Because the Court finds that Plaintiff has failed to present evidence of discriminatory conduct, it declines to consider whether Plaintiff has presented sufficient evidence of a discriminatory custom or policy.

1981; in particular, the Court finds scant evidence that any of the adverse employment actions claimed by Plaintiff occurred under circumstances suggestive of discrimination.  (*See* Def. Br. 5-9).  However, given the modest burdens imposed on Plaintiff in this procedural setting, the Court will assume, for the sake of argument, that Plaintiff has established a *prima facie* case that NYCHA discriminated against him when it hired Ms. Hadzibabic for Vacancy 812.  Thus, the Court will proceed to the second step of the *McDonnell Douglas* analysis, which requires NYCHA to articulate a non-discriminatory reason for its hiring decision.  *Abdu-Brisson,* 239 F.3d at 468-69.  NYCHA has articulated two such reasons: First, the NYCHA employees who hired Ms. Hadzibabic believed that she had more experience managing design projects (as opposed to construction projects).  (*See* Def. 56.1 ¶¶ 44, 69).  Second, and perhaps more importantly, the employees who hired Ms. Hadzibabic believed that she performed better during her interviews.  (*See id.* at ¶¶ 65-68).

The panelists who interviewed Ms. Hadzibabic reported that she was well-prepared for her interviews.  For example, Mr. Groom testified that Ms. Hadzibabic "brought in documentation, pictures, plans, [and] show[ed] us her resume, her portfolio."  (Lippman Decl., Ex. 5 at 52).  In addition, Mr. Stefanowicz testified that, in Ms. Hadzibabic's first interview, someone mentioned a "boiler project for a building"; by the time of her second interview, Ms. Hadzibabic had researched the boiler project so that she could discuss it at greater length.  (Lippman Decl., Ex. 7 at 30).  Mr. Stefanowicz was

"impressed … that [Ms. Hadzibabic] took the time to gain some knowledge and prepare for the [second] interview." (*Id.*).

The panelists also testified that Ms. Hadzibabic gave impressive answers to the questions she was asked. Mr. Groom testified that the "answers that [Ms. Hadzibabic] gave me were clear and strong." (Lippman Decl., Ex. 5 at 52; *see id.* at 52-53 (explaining that her "understanding of the [design] process and her participation in the process seemed very clear"). Similarly, Mr. Stefanowicz testified that he was impressed by Ms. Hadzibabic's "ability to explain" her projects and "g[et] to details." (Lippman Decl., Ex. 7 at 31, 37). He was also pleased to hear her "convey[] that she was part of a team … [and] looked to solve … problem[s] collectively." (*Id.* at 49-50; *see also* Lippman Decl., Ex. 9 at 39-40 (Mr. Eagle praising Ms. Hadzibabic's response to Question 9 on the interview questionnaire, which asked candidates to address a hypothetical management problem)).

By contrast, at least one of the panelists expressed concern about Plaintiff's answers to the interview questions. Mr. Eagle testified that he was concerned about Plaintiff's response to Question 6, which asked: "What changes have you made in working with others to be more effective at work?" (Lippman Decl., Ex. 9 at 38; Lippman Decl., Ex. 26 at 1). Plaintiff's response to this question included the statement: "People can't be as smart and accomplished as me." (*Id.*). Mr. Eagle explained the significance of this remark:

> You can see I put this in quotes [in the notes taken during the interview]. I was struck by it. It's one of the

things I've taken with me for a while[.] … That's an incredibly powerful statement, and again, it's one where I truly admire the confidence of that statement, but I also think there's a condescension to it, frankly, and this was my interpretation of it, where I thought that type of answer tells me that there's almost a divide if he's truly putting people below him, which is how I see that … and it makes it more difficult to be in a team building capacity.

(Lippman Decl., Ex. 9 at 38).   Mr. Eagle was also troubled by Plaintiff's answer to Question 16, which asked: "What's your greatest concern about the opportunity [to fill Vacancy 812]?"   (*Id.* at 40).   In response, Plaintiff said that he had no concerns.   (*Id.*).   Mr. Eagle believed that it was problematic for a candidate to have so much confidence about his ability to handle a new and challenging position that was "less technical and more people."   (*Id.*).

Because NYCHA has offered race-neutral reasons for its decision to hire Ms. Hadzibabic for Vacancy 812, Plaintiff must point to some evidence from which a reasonable jury could conclude that these race-neutral reasons were pretextual, or that NYCHA was motivated — at least in part — by Plaintiff's race.   (*See* Pl. Opp. 15).   *See Gordon,* 232 F.3d at 117.   Plaintiff contends that a jury could find that NYCHA was motivated — at least in part — by Plaintiff's race because Mr. Stefanowicz testified that, when he considered candidates for Vacancy 812, he "wanted to judge qualifications and [the] 'suitability of the individual.'"   (Pl. Opp. 18 (quoting Lippman Decl., Ex. 7 at 8)).   Mr. Stefanowicz also opined that it was appropriate to assess candidates for a managerial position using subjective criteria because management positions are "not just about technical knowledge.  [They are] about personnel, handling of people,

dealing with people, [and] dealing with issues," and there is not an objective

way to measure someone's ability to perform these tasks.  (*Id.* at 19 (quoting

Lippman Decl., Ex. 7 at 10-11)).

However, the fact that NYCHA employees used some subjective criteria to

evaluate the applicants for Vacancy 812 is not, by itself, evidence of

discrimination.  As the Second Circuit has explained:

> "[T]here is nothing unlawful about an employer's basing
> its hiring decision on subjective criteria, such as the
> impression an individual makes during an interview.
> [*Byrnie* v. *Town of Cromwell, Bd. of Educ.*], 73 F. Supp.
> 2d at 213.  At the same time, we have also cautioned
> that "an employer may not use wholly subjective and
> unarticulated standards to judge employee
> performance for purposes of promotion." *Knight* v.
> *Nassau County Civil Serv. Comm'n,* 649 F.2d 157, 161
> (2d Cir. 1981). This is because "[a]ny defendant can
> respond to a [discrimination charge] with a claim of
> some subjective preference or prerogative and, if such
> assertions are accepted, prevail in virtually every case."
> *Robinson* v. *12 Lofts Realty, Inc.,* 610 F.2d 1032, 1040
> (2d Cir. 1979) (internal quotation marks omitted).
> Accordingly, an "employer's explanation of its reasons
> must be clear and specific" in order to "afford the
> employee a full and fair opportunity to demonstrate
> pretext." *Meiri* v. *Dacon,* 759 F.2d 989, 996-97 (2d Cir.
> 1985).   Where an employer's explanation, offered in
> clear and specific terms, "is reasonably attributable to
> an honest even though partially subjective evaluation
> of ... qualifications, no inference of discrimination can
> be drawn." *Lieberman* v. *Gant,* 630 F.2d 60, 67 (2d Cir.
> 1980).

*Byrnie* v. *Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 104-05 (2d Cir. 2001).

Here, the NYCHA employees who considered candidates for Vacancy 812

gave "clear and specific" explanations for their decision to hire Ms. Hadzibabic

instead of Plaintiff.  *Byrnie*, 243 F.3d at 105.  As noted above, the NYCHA

employees involved in the hiring process indicated that Ms. Hadzibabic had more experience dealing with the design process, as opposed to the construction process. (*See* Def. 56.1 ¶¶ 44, 69). In addition, these employees identified specific, cogent reasons why they believed that Ms. Hadzibabic's interview performance was stronger than Plaintiff's. (*See supra* at 12-14; *see also* Lippman Decl., Ex. 7 at 29-31, 49; Lippman Decl., Ex. 9 at 38-40; Lippman Decl., Ex. 5 at 52-53; Lippman Decl., Ex. 8 at 18-19).

Thus, Plaintiff must identify some evidence suggesting that NYCHA's "partially subjective" reasons for hiring Ms. Hadzibabic were pretextual or dishonest. *See Byrnie*, 243 F.3d at 105 (internal quotation marks omitted). Plaintiff suggests that evidence of pretext can be found in Mr. Stefanowicz's deposition testimony. More specifically, Plaintiff contends that Mr. Stefanowicz's testimony was analogous to comments that the Second Circuit considered in *Abrams* v. *Dep't of Pub. Safety*, 764 F.3d 244 (2d Cir. 2014). In *Abrams*, an African American detective brought a Title VII claim against the Connecticut Department of Public Safety ("DPS"), alleging that he was excluded from the Department's Major Crimes Van (the "Van") on account of his race. *Id.* at 247. Notably, some of the individuals responsible for excluding the plaintiff from the Van said that other candidates were a "better fit" for the Van, and that the plaintiff simply "did not fit in." *Id.* at 249. The district court granted summary judgment in favor of the DPS, explaining that the plaintiff failed to produce sufficient evidence to support a reasonable inference of discrimination. *Id.* at 252. On appeal, the Second Circuit reversed. *Id.* at 254.

16

As the Court explained, statements about the plaintiff's ability to "fit in" with other detectives in the Van — who were not African American — "just might have been about race." *Id.* at 253 (emphasis omitted). Thus, the Court concluded, the statements about fitting in "raise[d] a genuine dispute as to whether the proffered reasons for Abrams's non-assignment to the Van were pretextual." *Id.* at 254.

Plaintiff contends that his case is analogous to *Abrams* because Mr. Stefanowicz testified that he would "only hire someone he [was] 'comfortable with'"; Plaintiff reasons that statements about feeling "comfortable" with another person — like statements about "fitting in" — might be a euphemism for racial bias. (Pl. Opp. 21 (quoting Lippman Decl., Ex. 7 at 34)). In the same vein, Plaintiff suggests that a jury could infer racial bias from Mr. Stefanowicz's statements that: (i) he "liked" Ms. Hadzibabic more than Plaintiff; (ii) he considered the "suitability of the individual[s]" who applied for jobs in his department; and (iii) he factored his "perception" of job applicants into his hiring decision. (*Id.* at 18-21 (quoting Lippman Decl., Ex. 7 at 8-9)).

Crucially, however, Plaintiff is taking Mr. Stefanowicz's statements out of context. While it is true that Mr. Stefanowicz said he would only hire someone he felt "comfortable with" (Lippman Decl., Ex. 7 at 34), he also testified that he felt comfortable with Plaintiff. (*See id.* at 48 ("Q: Are you comfortable with Mr. Coppin? A: Yes.")). And while Mr. Stefanowicz said that he "liked" Ms. Hadzibabic more than Plaintiff, he also articulated specific reasons why he "liked" Ms. Hadzibabic as a candidate. (*See id.* at 29 (explaining that Ms.

Hadzibabic distinguished herself with her "attention to detail, her knowledge, her personable manner, her demeanor"); *id.* at 29-30 (elaborating that Ms. Hadzibabic showed an attention to detail when she researched a "boiler project" that was mentioned during her first interview); *id.* at 31 (elaborating that Ms. Hadzibabic seemed knowledgeable in light of her "previous experience" and "ability to explain"); *id.* at 49 (elaborating that Ms. Hadzibabic seemed personable because "she conveyed that she was part of a team.  She conveyed that if she wasn't sure of something, she would go to somebody who had more knowledge in that particular area of engineering.  She conveyed that she looked to solve [a] problem collectively.")).

Similarly Mr. Stefanowicz's comments about the "suitability" of potential employees, as well as his comments about his "perception" of potential employees, were snippets of a larger conversation, in which Mr. Stefanowicz suggested that the purpose of interviewing a potential employee was to "judge the qualifications and suitability of the individual for that position depending on where it is."  (Lippman Decl., Ex. 7 at 8).  When Plaintiff's counsel asked Mr. Stefanowicz to explain "what it is that you're looking for when you talk about suitability," Mr. Stefanowicz replied that, for a "management position," he considers how candidates "handle themselves, the ability to deal with people."  (*Id.* at 9).  Mr. Stefanowicz proceeded to explain that, in deciding whether job applicants have the "ability to deal with people," he relies on his own "perception" of the applicants during the interview process because he does not know of any objective way to determine whether someone will be able to "deal[]

18

with a variety of people with a variety of personalities and … be able to adapt as a manager." (*Id.* at 9-11). Thus, in context, Mr. Stefanowicz's comment about "suitability" and "perceptions" could only be understood as a statement that he uses some subjective criteria to identify managers with management skills. As explained above, this statement is not enough to support an inference of discrimination. *See Byrnie*, 243 F.3d at 104 ("[T]here is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an interview."). More generally, when Mr. Stefanowicz's testimony is considered as a whole, none of his statements could reasonably be understood as euphemisms masking racial discrimination. This case is therefore distinguishable from *Abrams*.

Plaintiff also suggests that Mr. Stefanowicz's alleged reasons for hiring Ms. Hadzibabic might be pretextual because, although Mr. Stefanowicz suggested that checking references was "an important part of the vetting process" for job applicants, "this was not done for [the] person hired for [the] Deputy Director's position." (Pl. Opp. 20). Once again, however, Plaintiff is mischaracterizing the record. When Plaintiff's counsel asked Mr. Stefanowicz whether the NYCHA hiring committee had checked Ms. Hadzibabic's references, Mr. Stefanowicz first answered "Committee, no," but then expressed some confusion about the question. (*See* Lippman Decl., Ex. 7 at 32-33). In response, Plaintiff's counsel clarified: "*I'm just speaking about you.* You didn't talk to any references to satisfy yourself that your subjective judgment was correct?" (*Id.* (emphasis added)). Mr. Stefanowicz replied: "I did not, no." (*Id.*).

19

However, Adam Eagle, who joined the hiring committee for the second round of interviews, expressly testified that he checked Ms. Hadzibabic's references, and recalled that they spoke very highly of her.  (Def. 56.1 ¶ 73).  Plaintiff says that a jury could disregard this testimony because, years later, Mr. Eagle forgot the names and telephone numbers of Ms. Hadzibabic's references (Pl. 56.1 ¶ 73), but no reasonable jury could disregard Mr. Eagle's testimony on that basis.  *Cf. Crawford-El* v. *Britton*, 523 U.S. 574, 600 (1998) (noting that "if the [defendant] has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden" (footnote omitted)).  In any event, "evidence that the interview panelists were not careful in confirming the accuracy of each applicant's resume cannot support an inference that the panelists' ... explanations for choosing [Ms. Hadzibabic] lack credibility." *Pippin* v. *Town of Vernon*, 660 F. Supp. 2d 354, 366 (D. Conn. 2009).  Thus, Plaintiff cannot show that the decision not to promote him was racially motivated.[4]

---

[4]    To its credit, NYCHA has directed the Court's attention to a letter signed by other African American employees, expressing concern about "a lack of professional development and career advancement for professionals[,] i.e. engineers, architects, project managers, etc. of African American descent." (Lippman Decl., Ex. 43).  However, Plaintiff makes no mention of the letter in his brief.  (*See generally* Pl. Opp.).  In fact, Plaintiff's Rule 56.1 Statement explicitly states that the letter is "irrelevant to this lawsuit." (Pl. 56.1 ¶ 111).  As a result, the Court has not considered any arguments regarding the letter's admissibility or its significance.  *See Jackson* v. *Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) (explaining that, even in the summary judgment context, a counseled litigant can waive an argument by declining to address it).

### b.   Plaintiff Has Not Met His Burden With Respect to the Other Allegations of Discriminatory Conduct

Plaintiff alleges that, wholly apart from its decision to hire Ms. Hadzibabic, NYCHA engaged in other discriminatory conduct. Specifically, Plaintiff contends that NYCHA excluded him from high-profile meetings, and asked him to perform simple, administrative tasks. (Emanuel Decl., Ex. 1 ¶¶ 11-15).[5] The Court will assume, for the sake of argument, that these actions constitute adverse employment actions. *See Galabya* v. *New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (suggesting that an employee suffers an adverse employment action when his or her "material responsibilities" are "significantly diminished" (internal quotation marks omitted)). Even with this assumption in place, however, Plaintiff has not identified any evidence suggesting that *any* of these actions was taken because of his race. For example, Plaintiff has not alleged that any NYCHA employees made race-based comments to Plaintiff or anyone else. Nor has Plaintiff identified similarly situated employees of other races who were treated differently. Thus, as to these other claims of discrimination, Plaintiff has not

---

[5]   In an abundance of caution, NYCHA identified and responded to several events that Plaintiff might argue amounted to discriminatory conduct. To the extent that Plaintiff has not adopted these events in his opposition papers as evidence of discrimination, or to the extent that Plaintiff has affirmatively disclaimed their relevance, the Court has not considered these events. (*See, e.g.*, Pl. 56.1 ¶¶ 121-38 (rejecting, as "[i]rrelevant to this lawsuit," statements concerning filling of Vacancy 629, the Deputy Program Director in the Capital Projects Manhattan Program Unit)).

Plaintiff notes that he was demoted in 2008. (Pl. Opp. 22). The Court previously dismissed all claims based on discriminatory acts that occurred prior to April 4, 2012, with the consent of both parties, because those claims were time-barred. (*See* Dkt. #20). As a result, the Court need not address Plaintiff's 2008 demotion. The Court notes, however, that Plaintiff has produced no evidence indicating that his 2008 demotion was connected to his race.

even made out a *prima facie* case that NYCHA discriminated against him.  *See Holcomb*, 521 F.3d at 138 (explaining that, to make out a *prima facie* case of discrimination, an employee must identify some evidence that supports an inference of discrimination).

Plaintiff argues that there was no "credible explanation" for NYCHA's actions.  (Pl. Opp. 23).  Without conceding that point, the Court notes that NYCHA does not have to articulate *any* reason for its conduct until Plaintiff articulates a *prima facie* case of discrimination.  *See Abdu-Brisson,* 239 F.3d at 468-69.  As explained above, Plaintiff has not done so, and the Court therefore declines to consider NYCHA's proffered non-discriminatory reasons for its conduct.

### 2.    The Court Will Not Impose Sanctions on Plaintiff or His Attorney

This Court "has the inherent power to supervise and control its own proceedings and to sanction counsel or a litigant for bad-faith conduct." *Sussman* v. *Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995).  In addition, the Court "must impose an appropriate sanction" when an attorney improperly certifies that a discovery request complies with Federal Rule of Civil Procedure 26 if the improper certification is made "without substantial justification."  Fed. R. Civ. P. 26(g)(3).

NYCHA has asked this Court to impose sanctions against Plaintiff and his attorney because, when Plaintiff's attorney was deposing Ms. Hadzibabic and other witnesses, he asked them questions about Ms. Hadzibabic's performance *after* she was hired for Vacancy 812.  (*See* Def. Br. 26-35).  More

22

specifically, Plaintiff's attorney asked whether Ms. Hadzibabic's job performance suggested that she had trouble communicating in English (which is not her first language), and questioned whether NYCHA hired additional employees to help Ms. Hadzibabic handle her work load.  (*Id.* at 28-33). NYCHA contends that these questions could only have been asked to embarrass and harass Ms. Hadzibabic because her performance after she was hired for Vacancy 812 is irrelevant: in this regard, it argues that the question at the heart of this case is whether Ms. Hadzibabic appeared qualified at the time she was selected to be the Deputy Director.  (*Id.* at 28-35).  Thus, NYCHA insists, Plaintiff's attorney improperly certified that his deposition requests were "not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."  Fed. R. Civ. P. 26(g)(1)(B)(ii).  (*See id.*).

However, as Plaintiff's attorney points out, information about Ms. Hadzibabic's job performance after she was hired could be relevant evidence in this case, even if it could not be dispositive.  (*See* Pl. Opp. 26).  For example, if the witnesses had testified that Ms. Hadzibabic's difficulties with English interfered with her ability to communicate with employees, or that Ms. Hadzibabic struggled to manage her workload, that evidence could have cast doubt on the credibility of NYCHA employees' statements that Ms. Hadzibabic was extremely articulate during her interview, and seemed to have strong management skills.  Of course, none of the witnesses indicated that Ms. Hadzibabic's work performance was anything other than strong.  But Plaintiff's

attorney cannot be faulted for asking the questions that he did.  Moreover, the Court has reviewed the relevant deposition transcripts, and does not believe that Plaintiff's counsel was unduly aggressive with his examinations. Consequently, the Court will not impose sanctions.

## CONCLUSION

For the foregoing reasons, NYCHA's motion for summary judgment is granted, and the motion for sanctions is denied.  The Clerk of Court is ordered to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      June 7, 2016
            New York, New York
                                          _____
                                            KATHERINE POLK FAILLA
                                            United States District Judge